**In the United States District Court
for the District of Kansas**

———————

Case No. 22-cr-40031-TC

———————

UNITED STATES OF AMERICA

v.

JEREMY DAYTON CLARK

———————

**MEMORANDUM AND ORDER**

The United States charged Jeremy Dayton Clark with five counts of receiving, possessing, and distributing child pornography in violation of 18 U.S.C. § 2252(a). Doc. 1. Clark moves to suppress all evidence and information derived from the search of his home. Doc. 29. For the following reasons, Clark's motion is denied.

**I**

**A**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The basic purpose of this Amendment, as recognized in countless decisions of the Supreme Court, is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *United States v. Mathews*, 928 F.3d 968, 975 (10th Cir. 2019) (citing *Camara v. Mun. Ct. of S.F.*, 387 U.S. 523, 528 (1967) (cleaned up)).

The Fourth Amendment has been interpreted to proscribe two types of searches: first, when the government trespasses on a person's property; second, when it violates a person's reasonable expectation of privacy. *Kyllo v. United States*, 533 U.S. 27, 31–33 (2001); *Mathews*, 928 F.3d at 975. Under the trespass theory, the Fourth Amendment proscribes intrusion "on a constitutionally protected area," which usually means a person's property. *United States v. Jones*, 565 U.S. 400, 407 (2012). In addition to this "traditional property-based understanding," the Fourth Amendment has been interpreted

1

under a privacy-based approach. *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) (quoting *Florida v. Jardines*, 569 U.S. 1, 11 (2013). An expectation of privacy is protected if the defendant has exhibited an actual, subjective expectation of privacy and that expectation is one that society is prepared to recognize as objectively reasonable. *Smith v. Maryland*, 442 U.S. 735, 740 (1979). If the individual has neither a property nor a privacy interest or if the search is performed by a private actor, then the Fourth Amendment does not apply. *United States v. Benoit*, 713 F.3d 1, 6 (10th Cir. 2013).

Searches and seizures—of people, their homes, and their personal property—are presumed unreasonable when conducted without a warrant. *United States v. Karo*, 468 U.S. 705, 717 (1984). For a warrant to be valid, it must be supported by probable cause and must "particularly describ[e] . . . the persons or things to be seized." *United States v. Leary*, 846 F.2d 592, 600, 605 (10th Cir. 1988) (quoting U.S. Const. amend. IV) (alteration in original). Searches that exceed a valid warrant's scope are invalid. *Cf. Marron v. United States*, 275 U.S. 192, 196 (1927) (prohibiting "the seizure of one thing under a warrant describing another"); *Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 394 n.7 (1971); *Leary*, 846 F.2d at 600.

The remedy for an illegal search is exclusion. The exclusionary rule generally forbids the Government from using evidence obtained from an illegal search. *Herring v. United States*, 555 U.S. 135, 139 (2009). But that relief is not granted reflexively; the rule applies only where it "result[s] in appreciable deterrence" for law enforcement. *Id.* at 137, 141 (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). Suppression of evidence is therefore not "an automatic consequence of a Fourth Amendment violation." *Id.* at 137.

## B

The basis of this prosecution concerns Clark's use of a peer-to-peer website, known as Omegle. The Government alleges that Clark shared child sex abuse material (CSAM) with another user via a single Omegle-hosted video stream. At issue is whether the Fourth Amendment precludes the government's warrantless review of 25 of the 26 screenshots from that video chat that Omegle captured and reported to law enforcement and whether the warrant later obtained based on those 26 screenshots was legally sufficient to support the search of Clark's home.

**1.** It is helpful to understand how Omegle works. Omegle is a website that randomly connects one anonymous user with another anonymous user

for one-on-one video and text chats. Doc. 34 at 3;[1] Doc. 29 at 2. Video chats are conducted peer-to-peer via users' web browsers. Doc. 34 at 3.

Omegle does not require users to create a profile, register, or provide any identifying information. Doc. 34 at 3; *United States v. Wilbert*, No. 16-CR-6084, 2018 WL 6729659, at *2 (W.D.N.Y. Aug. 20, 2018). The only thing that Omegle captures from each user is their respective IP address. *United States v. DiTomasso*, 56 F. Supp. 3d 584, 588 (S.D.N.Y. 2014).[2] Upon entering the site, and before starting a chat, Omegle informs its users that all content on the platform is monitored and may be disclosed to law enforcement. Doc. 34-1 at 8; *Wilbert*, 2018 WL 6729659, at *2; *DiTomasso*, 56 F. Supp. 3d at 588. It also informs users that the service requires them to share their IP address with Omegle. *DiTomasso*, 56 F. Supp. 3d at 596.

Omegle uses a two-step process to monitor video chats for inappropriate content like CSAM. Doc. 34 at 3. First, Omegle runs software on each user's computer during a chat that captures periodic screenshots of those chats. *Id.* at 4; Doc. 34-1 at 5; *United States v. Powell*, 925 F.3d 1, 4 (1st Cir. 2018). That software applies an algorithm to review the captured screenshots and discards those that are likely to be appropriate. Doc. 34-1 at 6. The remaining images, which are more likely to be inappropriate, are sent to Omegle's human content moderators. *Id.* at 6–7; Doc. 29-1 at 3. Second, Omegle's content moderation team scans a large grid of the algorithm-flagged images and, based on a reviewer's training and experience, flags photos in the grid for distinct content and terms of service violations, including CSAM. Doc. 34-1 at 6–7; *see Powell*, 925 F.3d at 4.

When an Omegle content moderator flags a screenshot as containing CSAM, Omegle reports the screenshot to the National Center for Missing & Exploited Children (NCMEC). Doc. 34-1 at 8; Doc. 29-1 at 3. "Multiple files may be attached" to the report, in which case "the first file is the one which was specifically flagged." Doc. 29-1 at 3. The rest of the attached files come

---

[1] The Government attached and relies on the testimony of Omegle's founder, Leif K-Brooks. Doc. 34-1. Clark raised no objections to its consideration for purposes of resolving his Motion.

[2] "An IP address is a unique number identifying the location of an end-user's computer. When an end-user logs onto an internet service provider, they are assigned a unique IP number that will be used for that entire session. Only one computer can use a particular IP address at any specific date and time." *United States v. Wagner*, 951 F.3d 1232, 1240 (10th Cir. 2020) (quoting *United States v. Henderson*, 595 F.3d 1198, 1199 n.1 (10th Cir. 2010)).

from "the same IP address and/or ID cookie" and were "in the moderation system at the time the first file was flagged." *Id.*

NCMEC has "two primary authorizing statutes—18 U.S.C. § 2258A and 42 U.S.C. § 5773(b)—[which] mandate its collaboration with federal (as well as state and local) law enforcement." *United States v. Ackerman*, 831 F.3d 1292, 1296 (10th Cir. 2016). One of those duties is "to operate the CyberTipline as a means of combating Internet child sexual exploitation." *Id.* (citing 42 U.S.C. § 5773(b)). "Electronic communication service providers" with "actual knowledge" of a child pornography violation must report to NCMEC's CyberTipline. 18 U.S.C. § 2258A(a); 18 USC § 2258E(6); *Ackerman*, 831 F.3d at 1296. NCMEC must then forward that report to law enforcement. *Ackerman*, 831 F.3d at 1296 (citing 18 U.S.C. § 2258A(c)).

**2.** The video chat at issue in this case occurred in May 2019. Doc. 29 at 2. Omegle's monitoring system detected apparent inappropriate content during a video chat session. *Id.* In that session, a user sent various CSAM videos and images to another. Doc. 34 at 5. That same day, Omegle filed a CyberTipline Report with NCMEC. Doc. 34 at 5; *see* Doc. 29-1.

Omegle's report to NCMEC included the sender's IP address and 26 screenshots of the video chat session. Doc. 29 at 2; Doc. 34 at 6. Based on the timestamps and testimony at the hearing, all of the files appear to be from the same chat session. Doc. 29-1. Each of those images had been flagged by the algorithm and then sent to content moderators as likely containing inappropriate content. Based on Omegle's report, one of those 26 images was specifically marked as having been reviewed by a content moderator to confirm the presence of CSAM. Doc. 29 at 5–6. NCMEC confirmed that the screenshot Omegle flagged contained CSAM and traced the IP address to Kansas. Doc. 34 at 6. Based on that location, NCMEC forwarded its report to the Kansas Internet Crimes against Children (ICAC) taskforce in July 2019. *Id.*

Wichita Police Detective Jennifer Wright, assigned to the Kansas ICAC taskforce, reviewed all 26 screenshot files and confirmed that each contained CSAM. Doc. 34 at 7; Doc. 29-4 at 3. She also determined, using publicly available information, that the internet service provider associated with the IP address was Midcontinent Communications (Midco). Doc. 34 at 7; Doc. 29 at 7–8.

In August 2019, Detective Wright applied for a warrant to search Midco's records for the subscriber information associated with that IP address. Doc. 34 at 7. The same day, Midco told Detective Wright that Lisa Lee was the subscriber with a listed address in Lawrence, Kansas. *Id.* Detective Wright

then transferred the case to Lawrence Police Officer Lindsay Bishop based on the location.[3] *Id.*

Officer Bishop reviewed the CyberTipline Report, Detective Wright's report, and all of the screenshots Omegle captured. Doc. 29 at 9; Doc. 29-2 at 2; Doc. 34 at 7. Officer Bishop then used open-source records to identify three adults, including Clark, as residents of the address. Doc. 34 at 7. Officers surveilled the residence and, among other things, confirmed the Wi-Fi was not publicly accessible. *Id.* at 7–8.

After consulting with a prosecutor at the Douglas County District Attorney's Office, Officer Bishop applied for a search warrant of the residence on January 23, 2020. Doc. 34 at 8. Officer Bishop's affidavit for the warrant stated that she viewed Omegle's CyberTipline Report, which informed her that the user with the IP address at issue showed "a webcam video that contained child pornography." Doc. 29-2 at 2. It also stated that Officer Bishop reviewed all of the Omegle screenshots "and found them to contain sexually explicit activities with individuals under the age of 18 years old." *Id.* Two of those screenshots, the affidavit stated, "contained the same nude white female who appears to be under the age of 6 years old performing oral sex on a white adult male's penis." *Id.* The affidavit identified three adults, including Clark, residing at the residence through various sources, including Kansas Driver's License information and physical surveillance. *Id.* at 2–3. The affidavit also stated that "no unsecured WIFI networks were detected" outside the residence. *Id.* at 3. The affidavit further provided that Officer Bishop knew "that subjects who collect child pornography typically retain the images for later viewing" and "that electronic images and videos can be easily shared and transferred between electronic devices." *Id.* Bishop did not detail the bases of her knowledge, such as training she had received, nor did she identify herself as a law enforcement officer. *Id.*

The judge authorized the warrant, which officers executed on January 24, 2020. Doc. 29-3; Doc. 34 at 8. The warrant stated that the affidavit and application were "made to [the judge] by Officer Lindsay Bishop." Doc. 29-3 at 1. Both the affidavit and application were "incorporated by reference" in the warrant. *Id.* Officers seized more than 40 electronic devices, including from a basement bedroom which they later learned belonged to Clark. Doc.

---

[3] Clark initially challenged the warrant obtained by Detective Wright for subscriber information from Midco. Doc. 29 at 7–8. At the hearing, Clark withdrew that argument (based on the Government's assertion that he lacked standing to challenge it, Doc. 37 at 10 n.41) and no longer challenges the warrant that led to the subscriber information.

29 at 14; Doc. 29-6; Doc. 34 at 8. Officer Bishop submitted Clark's laptop and phone to forensic examiners, who located more than 1000 images and videos of CSAM. Doc. 34 at 8.

**3.** Ultimately, a grand jury returned a five-count indictment against Clark for receiving, possessing, and distributing child pornography. The United States charged Clark with three counts of sexual exploitation of a minor for receipt of child pornography in violation of 18 U.S.C. §§ 2252(a)(2)(A) and (B); one count of sexual exploitation of a minor for distribution of child pornography in violation of 18 U.S.C. §§ 2252(a)(2)(A) and (B); and sexual exploitation of a minor for possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B). Doc. 1.

## C

Clark moves to suppress the evidence obtained from his home on three bases. Doc. 29. First, Clark claims law enforcement's review of all of the Omegle screenshots—and not just the single screenshot that an Omegle employee and a NCMEC employee reviewed—constituted a warrantless search in violation of the Fourth Amendment because it impermissibly expanded Omegle's review. *Id.* at 14–21. Second, Clark claims the residential warrant lacked the particularity required by the Fourth Amendment. *Id.* at 21–28. Third, Clark argues the residential warrant was not supported by probable cause and was thus overbroad. *Id.* at 28–35. The Government opposes each argument. Doc. 34.

An evidentiary hearing on the motion to suppress was held on March 22, 2023. Doc. 48. The parties presented live testimony from Detective Wright, Officer Bishop, and Clark. In addition to their motion briefs, the parties submitted supplemental briefs addressing issues discussed at the hearing. Docs. 50 & 52.

## II

Clark's motion to suppress is denied. The Kansas law enforcement officers' review of the screenshots of the Omegle video chat did not violate the Fourth Amendment because Clark did not have a privacy or possessory interest in the Omegle video chat and, even if he did, law enforcement's search did not impermissibly expand Omegle's review. Further, the warrant does not suffer from staleness, overbreadth, or lack of particularity, and is supported by probable cause.

## A

Clark moves to suppress the 25 screenshots of the video chat that Omegle identified as inappropriate content and provided to NCMEC. Doc. 29 at 1, 14–21. In doing so, he does not contest law enforcement's review of the single screenshot that an Omegle employee confirmed did in fact contain CSAM. But because no human at Omegle individually confirmed that the other 25 screenshots Omegle took from the same video chat contained CSAM prior to law enforcement's review, Clark argues that the officers' review constituted an unlawful search in violation of the Fourth Amendment. For support, he claims he had both an expectation of privacy and a property interest in the peer-to-peer video chat conducted via Omegle, *id.* at 15, and that the officers' search exceeded the scope of Omegle's review, *id.* at 19–20.

Clark's arguments are unavailing. There was no search for purposes of the Fourth Amendment for three reasons. One, Omegle captured, reviewed, and marked as containing inappropriate content all of the screenshots it took of Clark's video chat that it delivered to NCMEC. That one of those screenshots was subjected to a second level of review by a human to confirm the presence of CSAM does not limit what law enforcement could do upon receipt. Two, Clark did not have a reasonable expectation of privacy in the video chat: he chose to broadcast CSAM to a randomly selected anonymous individual on a platform that he knew (or should have known) monitored for, among other things, CSAM. And three, Clark had no cognizable property interest in the video chat or the screenshots that Omegle created and shared with law enforcement.

**1.** There was no Fourth Amendment search. *Contra* Doc. 29 at 19–20. The Fourth Amendment does not apply to private searches, *United States v. Ackerman*, 831 F.3d 1292, 1295 (10th Cir. 2016), and Omegle's capture and production of the screenshots was such a search, *United States v. DiTomasso*, 81 F. Supp. 3d 304, 307 (S.D.N.Y. 2015) (holding "Omegle's monitoring constituted a purely 'private search,' beyond the reach of the Fourth Amendment"); Doc. 29 at 1 (acknowledging the same). Further, the government did not exceed the scope of the private search because the Omegle-created screenshots had already been filtered out for content moderation review as potential contraband. *See United States v. Jacobsen*, 466 U.S. 109, 126 (1984) (rejecting Fourth Amendment challenge to chemical testing of potential contraband disclosed to government by private party).

Fourth Amendment protections apply only to government action, not to searches by private parties acting independently of the government. *Jacobsen*, 466 U.S. at 113. In *Walter v. United States*, 447 U.S. 649 (1980), boxes of film were inadvertently delivered to a private company bearing "explicit

descriptions of the contents." *Id.* at 651–52. The company called law enforcement to pick up the packages and the authorities then viewed the films with a projector. *Id.* at 652. Law enforcement's conduct amounted to a Fourth Amendment search because "the prior private search was much narrower, involving only the visual inspection of the labels on the outside of the film boxes." *Ackerman*, 831 F.3d at 1306 (citing *Walter*, 447 U.S. at 656–60).

*Jacobsen* came to the opposite conclusion. There, FedEx employees opened a damaged package, found suspicious plastic bags of white powder inside, and alerted law enforcement, providing a description of their findings. *Jacobsen,* 466 U.S. at 111. Law enforcement repeated FedEx's search but also chemically tested the powder to confirm it was cocaine. *Id.* at 111–12. The Court found that when a private party finds contraband, it may convey that information to law enforcement or its agent, which may then replicate the private party's inspection without a warrant and without violating the Fourth Amendment. *Id.* at 117. But "additional invasions of [the individual's] privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search." *Id.* at 115. There was no Fourth Amendment violation in *Jacobsen* because the government's search was equivalent in scope to the private party's and there was "a virtual certainty that nothing else of significance" could be revealed by the governmental search. *Id.* at 119; *accord Ackerman*, 831 F.3d at 1306.

Clark argues that "the government's warrantless search of the video chat files provided by Omegle LLC exceeded the scope of the private company's search" as the government's search did in *Ackerman v. United States*. Doc. 29 at 16-21 (citing 831 F.3d at 1296). The circumstances of the search at issue relative to Clark's video chat are materially distinguishable.

In *Ackerman*, the Tenth Circuit found that the government's search expanded the scope of the private party's search in violation of the Fourth Amendment. 831 F.3d at 1304–06. There, the ISP's hash-value-matching protocol identified one of four attachments in the defendant's email as potential child pornography and forwarded that email and all four attachments to NCMEC. *Id.* at 1294. None of the unflagged attachments on Ackerman's email matched a known CSAM hash-value, and the only association between the attachments was that they appeared in the same email that Ackerman created. *See id.* Nonetheless, NCMEC reviewed both the email and the three unflagged attachments. *Id.* at 1304. The Tenth Circuit found that this review exceeded the private party's because NCMEC knew nothing about the email and unflagged attachments from AOL's review—those items had not been identified as containing child pornography. *Id.* at 1305–06. But *Ackerman*'s analysis proceeded from the district court's assumption that the defendant had a reasonable expectation of privacy in his email. *Id.* at 1305, 1309

(remanding to determine whether the defendant had a reasonable expecta-
tion of privacy in his email and noting that development of the factual record
"could well impact the legal analysis").

Like *Ackerman*, this case concerns multiple electronic items. But the sim-
ilarities end there. The reported files here are fundamentally different from
the email attachments in *Ackerman*. Omegle monitored a single video chat,
producing the 26 screenshots at issue. Each shared the same identifying in-
formation (*e.g.*, IP address, ID cookie, and webcam information), and each
file made it into Omegle's content moderation pool as likely containing in-
appropriate material. Unlike in *Ackerman*, where there was no reason to be-
lieve the email and unflagged attachments contained contraband, each of
these files was subjected to Omegle's review protocol and each was associ-
ated with the flagged file containing CSAM. And each file was created by
Omegle's monitoring software, not Clark. The screenshots were not distinct
files created by a defendant and attached to an email directed to a specified
person as in *Ackerman*. They were slices of the single video chat that Omegle
hosted and monitored.

Other circuits have similarly distinguished *Ackerman* on this basis and
held in similar circumstances, albeit with distinct files, that the government's
review of images which have been flagged by the private party's automated
review is not a Fourth Amendment search. *United States v. Miller*, 982 F.3d
412 (6th Cir. 2020); *United States v. Reddick*, 900 F.3d 636, 637 (5th Cir. 2018).
*Miller* was distinguishable from *Ackerman* because the officer "viewed only
files with hash-value matches." 982 F.3d at 429. "Google's technology [had
already] 'opened' and 'inspected' the files" resulting in a "virtual certainty"
that the officer's viewing of the same files would disclose what the private
party already found—child pornography. *Id.* at 429–31. And in *Reddick*, the
private party flagged images as CSAM through an automatic hash value sys-
tem; it did not actually "view" the file. 900 F.3d at 639. After receiving the
report, police then opened and viewed all the files. *Id.* *Reddick* distinguished
itself from *Ackerman* because the officer's review "merely dispelled any resid-
ual doubt about the contents of the files." *Id.*

The indicia of relatedness here make this case more like *Miller* and *Reddick*
than *Ackerman*. The files were all in the content moderation pool based on
Omegle's algorithm identifying them as likely containing inappropriate con-
tent. All files shared the same identifying information, revealing that they
originated from the same IP address and ID cookie and were captured from
the same webcam. And the timestamps of each file indicated that they came
from the same video chat as the file Omegle confirmed to be CSAM. These
circumstances reliably indicated that the files contained the same type of con-
tent as the viewed image, and Detective Wright and Officer Bishop's reviews

thus "merely dispelled any residual doubt." *Reddick*, 900 F.3d at 639. This is not a case where prior to law enforcement's review, "one could only draw inferences about what was" contained on the files. *Walter*, 447 U.S. 649, 657 (1980). In other words, because law enforcement's review did not expand on Omegle's, it compromised no legitimate privacy interest that Omegle's creation of the screenshots and review had not already discovered and disclosed. *See Jacobsen*, 466 U.S. at 123.

**2.** Even assuming that opening the 25 files expanded on Omegle's review, Clark had no privacy interest in the screenshots that Omegle took of his video chat that contained CSAM, and thus they were not protected under the Fourth Amendment. *Contra* Docs. 29 at 15 & 37 at 3. Any subjective expectation of privacy that Clark had was objectively unreasonable.

Clark asserts that he had a subjective expectation of privacy. Doc. 29 at 15; Doc. 37 at 5. To prove that he had a reasonable expectation of privacy, the defendant must first demonstrate that he "manifested a subjective expectation of privacy in the area searched." *United States v. Johnson*, 584 F.3d 995, 999 (10th Cir. 2009) (citation omitted). Clark could not recall how many times he had used Omegle but testified that he thought his video chats were private because they were anonymous. But that claim is dubious. There is little evidence that Clark "s[ought] to preserve" his chat and the information contained therein as private. *United States v. Johnson*, 43 F.4th 1100, 1111 (10th Cir. 2022); Orin S. Kerr, *Katz Has Only One Step: The Irrelevance of Subjective Expectations*, 82 U. Chi. L. Rev. 113, 127 (2015) (observing the subjective test measures whether people have given up their rights in private spaces "when they consent to have others enter . . . and observe what occurs inside"). Clark was or should have been aware that the chat, in which he sent CSAM to a randomly selected anonymous user, was monitored. *United States v. DiTomasso*, 56 F. Supp. 3d 584, 588 (S.D.N.Y. 2014). Nevertheless, this Memorandum and Order assumes without deciding that Clark's testimony has satisfied his burden to demonstrate a subjective expectation of privacy.

But even crediting Clark with subjectively believing that his Omegle chat was private, there is no indication that society is prepared to recognize that belief as reasonable. The "ultimate question" is whether a defendant's claim to privacy from the government's intrusion "is reasonable in light of all the surrounding circumstances." *United States v. Barrows*, 481 F.3d 1246, 1248 (10th Cir. 2007) (quoting *United States v. Anderson*, 154 F.3d 1225, 1229 (10th Cir. 1998)); *United States v. Angevine*, 281 F.3d 1130, 1134 (10th Cir. 2002). Clark has not met his burden to show that he had an objectively reasonable

expectation of privacy from Omegle's monitoring his video chat.[4] The method and means of engaging in an Omegle video chat rejects any claim that society is prepared to recognize Clark's expectation as reasonable because there is no clear Fourth Amendment analogue, anonymity does not equate to privacy, and he accepted terms which told him he was being monitored.

Clark attempts to analogize the Omegle video chat with means of communication that have traditionally been protected. Doc. 29 at 16; Doc. 37 at 5; Doc. 50 at 5. But the Omegle video chats bear little resemblance to those secure and discrete communications where courts have recognized an expectation of privacy. *Contra* Doc. 37 at 5; Doc. 50 at 5. Clark did not enter into a phone booth to place a call to a known individual. Nor did he send an email—with attachments—to a known recipient. To the contrary, Clark's method and means of communication bore none of those hallmarks of privacy or attempts to exclude. Instead, he accessed a web service—that he knew or should have known monitored the videos for unlawful behavior and would provide that information to law enforcement, *DiTomasso*, 56 F. Supp. 3d at 588—that randomly connected him by way of video chat to an unknown, anonymous person and voluntarily displayed contraband in the form of child pornography.

Declining to afford the screenshots of his Omegle video chat the same protection that phone calls and emails receive would not diminish "the aims

---

[4] Whether viewed as the "digital age," *United States v. Jones*, 565 U.S. 400, 417 (2012) (Sotomayor, J., concurring), or the "Cyber Age," *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017), technical advances and their use in society that those phrases are attempting to describe have caused courts to reevaluate constitutional expectations, *see Carpenter v. United States*, 138 S. Ct. 2206, 2213-19 (2018), and spawned a burgeoning academic field, Susan Freiwald & Stephen Wm. Smith, *The Carpenter Chronicle: A Near-Perfect Surveillance*, 132 Harv. L. Rev. 205 (2018). But these advancements in technology do not seem to undermine—or at least do not appear to have been held by the Supreme Court or Tenth Circuit to overrule—the premise that an individual has no legitimate expectation of privacy in information voluntarily turned over to third parties, even if based on the assumption that it will be used only for a limited purpose. *Carpenter*, 138 S. Ct. at 2216 (relying on *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979), and *United States v. Miller*, 425 U.S. 435, 443 (1976)); *but see Jones*, 565 U.S. at 417 (Sotomayor, J., concurring) (questioning whether reevaluation of *Smith* is necessary because of the pervasiveness of technology's reach into daily lives: "People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers.").

of a free and open society." *United States v. Johnson*, 584 F.3d 995, 1000 (10th Cir. 2009) (quoting 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.1(b), 443 (4th ed. 2004 & Supp. 2008–09)). Omegle is a "notorious chat roulette service," *United States v. Manning*, 833 F. App'x 43, 44 (8th Cir. 2021), and it adopted monitoring software more than ten years ago due to "the amount of inappropriate content that it had," *United States v. DiTomasso*, 81 F. Supp. 3d 304, 307 (S.D.N.Y. 2015) (recounting testimony of Leif K-Brooks who acknowledged a business purpose for monitoring chats to avoid proliferation of unlawful conduct); *see also United States v. Almodovar*, 738 F. App'x 610, 611 n.3 (11th Cir. 2018) (noting testimony of officer who described Omegle as a website that "minors go on [] and do sexual acts to try to engage people for money"); *United States v. Grisanti*, No. 416CR00018, 2018 WL 1522656, at *2 (S.D. Ind. Mar. 28, 2018) (observing that Omegle has been described as "frequently used by sexual predators to exploit minors"). Omegle is not analogous to phone and email.

At least one court has reached a contrary conclusion, and Clark relies on that reasoning. Doc. 50 at 5 (citing *DiTomasso*, 56 F. Supp. 3d at 591). *DiTomasso* found that there was "no distinction" between an Omegle chat and email or a phone call. 56 F. Supp. 3d at 592. The court rejected the government's argument that an Omegle chat was equivalent to a public chat room where the "user kn[ows] that his comments are out there for the rest of the world to see." *Id.* (citation omitted). Rather, "the whole point of Omegle's service is to allow two strangers to chat anonymously, and only with one another." *Id. DiTomasso* then summarily analogized the Omegle chat to email and phone calls, stating, "[b]oth involve one-on-one interactions that users clearly expect to be kept private." *Id.*

But the conclusion that there is "no distinction" between an Omegle chat and other forms of communication is not so obvious. *First*, Omegle chats are fundamentally distinct from protected forms of communication that society recognizes as private. The Fourth Amendment has long been recognized as a necessary "guardian of private communication." *United States v. Warshak*, 631 F.3d 266, 286 (6th Cir. 2010). Letters and emails receive protection, in part, because there is some attempt to preserve them as private, such as through sealing an envelope and delivering them to known individuals. *Id.* at 285. But unlike a phone call or email, Clark chose to broadcast CSAM to a random recipient that could very well have been a law enforcement officer, his neighbor, or an individual halfway around the globe. While an email— the modern-day equivalent of a letter—deserves strong Fourth Amendment protection because it is an "indispensable," "essential means[,] or necessary instrument for self-expression," *id.* at 286 (quoting *City of Ontario v. Quon*, 560 U.S. 746, 760 (2010)), Omegle lacks those attributes. The principal reason is

that the communication is monitored by Omegle to prevent unlawful conduct from occurring on its platform. That type of monitoring is inconsistent with the expectations the Fourth Amendment is designed to protect. *See also United States v. Sporn*, No. 21-10016, 2022 WL 656165, at *9 (D. Kan. Mar. 4, 2022) (finding no reasonable expectation of privacy in Twitter content); *United States v. Stratton*, 229 F. Supp. 3d 1230, 1242 (D. Kan. 2017) (same as to information stored on a PlayStation device). Clark has failed to demonstrate that Omegle's screenshots of his video chat are deserving of the same Fourth Amendment protections as phone calls, letters, or emails. *See, e.g.*, *Smith v. Maryland*, 442 U.S. 735, (1979) (no expectation of privacy to information shared with a third party); *United States v. Miller*, 425 U.S. 435, 443 (1976) (no expectation of privacy to information revealed on the assumption that it will be used for only a limited purpose).

*Second*, the method of communicating over Omegle is dissimilar from other protected means. Omegle users are not writing or speaking to a known colleague but are instead communicating with random strangers. Clark argues that Omegle's appeal lies in its anonymity—"users were not required to set up an account, register, or otherwise reveal their identity"—and that equates to privacy. Doc. 37 at 5–6; Doc. 29 at 4. But anonymity does not equate to an expectation of privacy: no one at a costume party should believe that their conduct is private simply because they may not be easily identified.

An argument similar to Clark's was rejected in *United States v. Rosenschein*, No. CR 16-4571, 2020 WL 6680657 (D.N.M. Nov. 12, 2020). There, the defendant uploaded images containing child pornography to an anonymous chat room on a similar website, Chatstep. *Rosenschein*, 2020 WL 6680657, at *4. Like Omegle, Chatstep is "entirely anonymous [and] require[s] no registration or identification," and it informs its users prior to entering a chat that the platform is monitored and illegal content will be reported. *Id.* *3–4. *Rosenschein* held that the defendant lacked an objectively reasonable expectation of privacy because he shared the images with strangers. *Id.* at *4.

The same is true here. Clark entered into a conversation with an anonymous individual, selected at random. That might have been an attempt to avoid detection, but it cannot be construed as private. "It strains credulity to think that the law recognizes as private communications made to unknown individuals. As a matter of common sense, the first step one takes in preserving the privacy of a communication is to know the identity of the person with whom one is communicating." *Rosenschein*, 2020 WL 6680657, at *4. And all of this, of course, is mediated by an application that monitors the anonymous videos for, among other things, CSAM. One generally does not dial a phone number at random and then share contraband with the individual on the other end, knowing that the conversation is monitored by a third party and

hoping that the recipient is neither a law enforcement officer nor someone who might tip off law enforcement.

Clark further argues that "Omegle's terms of service do not affect the Fourth Amendment analysis"—*i.e.*, his acceptance of those terms did not negate a reasonable expectation of privacy from the government's intrusion. Doc. 50 at 4. Clark again relies on *DiTomasso. Id.* at 5 n.13. That court arrived at a similar conclusion, rejecting the government's argument that the defendant lacked a reasonable expectation of privacy because Omegle warned him it would monitor his chats. 56 F. Supp. 3d at 592. The court reasoned that "use of electronic devices almost always requires acquiescence" to terms and that acquiescence cannot be "enough to waive one's expectation of privacy." *Id.* at 592. In so finding, it analogized an employee's and a hotel guest's expectations. *Id.* at 593. Both expect that their supervisor or hotel staff may access their rooms, but "it does not automatically follow that they also consent to searches by law enforcement." *Id.*

Clark's invocation of this reasoning ignores a crucial point. It was not the government that conducted the inquiry that led to the discovery of Clark's CSAM. To the contrary, Omegle did. Based on its discovery that one of its users (Clark) transmitted CSAM using its communication facilities, Omegle turned the material over to law enforcement. That was no surprise or, at the very least, should not have been a surprise. Omegle informed its users that it monitored activity and that its records may be turned over to law enforcement. *Id.* at 588. Indeed, this is why the *DiTomasso* court ultimately denied the motion to suppress. *See United States v. DiTomasso*, 81 F. Supp. 3d 304, 306, 309–10 (S.D.N.Y. 2015) (recognizing Omegle's monitoring was for business purposes and thus constituted a purely 'private search,' beyond the reach of the Fourth Amendment").

A communication facility's terms of service may not waive Fourth Amendment rights from government intrusion, but federal courts in Kansas have recently found that they do inform the objective reasonableness of a defendant's expectation of privacy to be free from such private monitoring. In *United States v. Sporn*, No. 21-10016, 2022 WL 656165, at *9 (D. Kan. Mar. 4, 2022), the court held the defendant lacked a reasonable expectation of privacy given Twitter's "zero tolerance policy for child sexual exploitation" and the defendant's violation of that policy. And, in *United States v. Ackerman*, 296 F. Supp. 3d 1267, 1271–73 (D. Kan. 2017), the Court found that the defendant accepted the terms "by using his email account" and that these terms "limit[ed] [the d]efendant's objectively reasonable expectation of privacy." Similarly, the court in *United States v. Stratton*, 229 F. Supp. 3d 1230, 1242 (D. Kan. 2017), held that the terms "explicitly nullified its users reasonable expectation of privacy" even if users had not read them. The only

contrary decision in Kansas appears to be *United States v. Irving*, 347 F. Supp. 3d 615, 623 (D. Kan. 2018), where the court held that the terms gave the defendant a reasonable expectation of privacy in his Facebook account because they notified him that he "own[ed] all of the content and information and c[ould] control how to share it." Not only does Clark fail to cite a similar provision in Omegle's terms, but it was Omegle who created the screenshots that it sent to law enforcement. While the parties disagree as to the specific language used in the terms of service applicable when Clark accessed Omegle, Omegle has notified its users that it monitored the content of the video chats for years before Clark initiated his video chat.[5] Doc. 34-1 at 8.

Again, the "ultimate question" is reasonableness "in light of all the surrounding circumstances." *United States v. Barrows*, 481 F.3d 1246, 1248 (10th Cir. 2007) (citation omitted). Clark's acceptance of Omegle's terms plays a role in that consideration. *Contra* Doc. 50 at 4. In fact, the Tenth Circuit has observed that the extent to which users are "aware of or acquiesce[]" in a platform's monitoring is relevant to determining expectation of privacy. *United States v. Ackerman*, 831 F.3d 1292, 1305 (10th Cir. 2016). Omegle's terms made—or should have made—Clark aware that his activity was being monitored and, by using the website anyway, he agreed to that monitoring. The circumstances demonstrate that any subjective expectation of privacy Clark had was objectively unreasonable. Clark has not satisfied his burden "of demonstrating a subjective expectation of privacy that society is prepared to recognize as reasonable." *United States v. Nicholson*, 144 F.3d 632, 636 (10th Cir. 1998) (citing *United States v. Conway*, 73 F.3d 975, 979 (10th Cir.1995)); *United States v. Maestas*, 639 F.3d 1032, 1035 (10th Cir. 2011).

**3.** Clark also had no property interest in the screenshots Omegle took of his video chat. *Contra* Doc. 29 at 15; Doc. 50 at 4. In addition to (or instead of) the *Katz* formulation of Fourth Amendment doctrine based on reasonable expectation of privacy, recent Supreme Court cases have suggested that

---

[5] The Government asserts that Omegle "offers users an 'Adult' or unmonitored site to keep conversations private," Doc. 34 at 13, and that Omegle's terms of service notify users that Omegle monitors its "communication channels," Doc. 34-2 at 2. Clark argued at the hearing that he was unaware of this alternative site and that it is unclear whether these exact terms were in effect at the time of the alleged activities. As far back as 2014, Omegle's terms warned users that their activity was being monitored for potential release to law enforcement. *DiTomasso*, 56 F. Supp. 3d at 592. And beginning in 2013, Omegle began offering an unmonitored version of its service for users who were repeatedly banned for inappropriate content. *United States v. DiTomasso*, 81 F. Supp. 3d 304, 307 (S.D.N.Y. 2015). As of May 12, 2023, the homepage states, "Video is monitored. Keep it clean!" *Omegle*, https://www.omegle.com/ (last visited May 12, 2023).

proper Fourth Amendment analysis also requires consideration of property interests. *See United States v. Jones*, 565 U.S. 400, 409 (2012); *see also* Danielle D'Onfro, Daniel Epps, *The Fourth Amendment and General Law*, 132 Yale L.J. 910, 913-20 & n.5 (2023) (tracing the origin of Fourth Amendment jurisprudence, academic critiques of the *Katz* doctrine, a return to property-based analysis, and positive-law solutions to Fourth Amendment questions championed by legal scholars, including Professors Baude, Kerr, and Re). "For much of our history, Fourth Amendment search doctrine was 'tied to common-law trespass' and focused on whether the Government 'obtains information by physically intruding on a constitutionally protected area.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (quoting *Jones*, 565 U.S. at 405, 406 n.3). Based on this notion, Clark argues that the officers' review of the screenshots of his video chat constituted a search of his property. Doc. 29 at 15; Doc. 37 at 3; Doc. 50 at 4 n.10.

In *Ackerman*, the Tenth Circuit found that a search occurred under the traditional trespass test because the government's opening and examining the defendant's email and its attachments constituted a "physical intrusion (a trespass) on a constitutionally protected space or thing ('persons, houses, papers, and effects')." *United States v. Ackerman*, 831 F.3d 1292, 1307–08 (10th Cir. 2016) (Gorsuch, J.). Virtual correspondence—*i.e.*, email—was an "obvious analogy" to physical correspondence, such as letters, which the framers sought to protect. *Id.* at 1308; *see also Carpenter*, 138 S. Ct. at 2269 (Gorsuch, J. dissenting) ("[F]ew doubt that e-mail should be treated much like the traditional mail it has largely supplanted—as a bailment in which the owner retains a vital and protected legal interest.").

Unlike the emails in *Ackerman*, the Omegle chat and the screenshots Omegle captured of that chat are not such an "obvious analogy." An email has indicia of property that an Omegle chat does not—it typically requires the composer to create and hold an account with a unique address over which one typically holds exclusive possession, and the contents of the inbox are password protected, excluding the general public. *Cf. United States v. Wright*, 838 F.3d 880, 886 (7th Cir. 2016) ("Like a lock on a briefcase or storage trunk, password protection on a computer demonstrates the owner's affirmative intent to limit access to its contents."). The decision as to what is said in the email, to whom it is sent, and what is attached to it (*e.g.*, photographs, plans, or otherwise) is a series of composition decisions that the individual makes with an expectation that they will remain private.

But other than being a participant in the video chat, Clark had no hand in the creation of the screenshots at issue. He did not select when to take a screenshot or choose what to do with the screenshots once they were taken. Clark might have chosen what to share in the video chat, but he has no

possessory interest in the screenshots that Omegle captured and reviewed. This act of creating the screenshots and reviewing them for CSAM was done by Omegle—not Clark—consistent with the retained discretion described in its terms of service. Omegle then shared its own images with NCMEC, as required by law, 18 U.S.C. § 2258A(a), which in turn passed them along to local law enforcement. Omegle's action is not surprising: while federal law does not require anyone to search for CSAM, it does require private service providers with "actual knowledge" of CSAM to notify NCMEC. 18 U.S.C. § 2258A(a).

Since *Ackerman*, there has been no "decision actually applying [its] property-based test to suppress a search of electronic communications." *United States v. Sporn*, No. 21-10016, 2022 WL 656165, at *10–11 (D. Kan. Mar. 4, 2022) (rejecting a property-based challenge because Twitter informed its users that it would disclose any violative content to NCMEC); *accord United States v. Meals*, 21 F.4th 903, 909 (5th Cir. 2021) (distinguishing *Ackerman* because the search was of the files that Facebook created, not unopened material that the defendant created).[6] Because Clark has not adduced any evidence of a property interest in the video chat or the screenshots that Omegle took, he cannot show that the government violated his Fourth Amendment rights on that basis.

## B

Presumably on the assumption that the 25 screenshots have been suppressed, Clark next challenges the residential warrant, arguing that it violated the Fourth Amendment for three reasons. First, Clark argues the warrant was insufficiently particular in that it failed to limit the items to be seized by reference to a crime or the type of item and relied on impermissible "catchall" language. Doc. 29 at 21–29. Second, Clark argues that the warrant failed to establish probable cause to believe there was a nexus between the suspected activity and the items to be searched. *Id.* at 28–34. And third, Clark argues the warrant was overbroad. *Id.* at 34–35. Each of these arguments fails.

---

[6] Assuming that NCMEC was a governmental entity, the Fifth Circuit in *Meals* denied a request to suppress information contained in a cyber tip that Facebook submitted, holding that NCMEC's search of files provided by Facebook did not exceed the scope of Facebook's search because NCMEC merely reviewed the "identical evidence that Facebook reviewed and placed in a cyber tip" and that NCMEC did not—unlike in *Ackerman*—access or review any unopened container, email, or attachment. 21 F.4th at 908.

For a warrant to be valid, it must be supported by probable cause and must "describe with particularity who and what can be searched and seized." *United States v. Palms*, 21 F.4th 689, 697 (10th Cir. 2021) (citing U.S. Const. amend. IV). In reviewing the issuing judge's determination of probable cause, courts ask "whether, under the totality of the circumstances presented in the affidavit, the judge had a substantial basis for determining that probable cause existed." *United States v. Edwards*, 813 F.3d 953, 959–60 (10th Cir. 2015). The reviewing court "give[s] great deference" to the issuing judge's finding, *id.*, and "interpret[s] search warrant affidavits in a common sense and realistic fashion," *United States v. Grimmett*, 439 F.3d 1263, 1270 (10th Cir. 2006).

**1.** Clark argues that the residential warrant violates the Fourth Amendment because it is insufficiently particular. Doc. 29 at 25–27. A warrant that is not particularized violates the Fourth Amendment because it "vest[s] the executing officers with unbridled discretion to conduct an exploratory rummaging through [the defendant's property] in search of criminal evidence." *United States v. Cotto*, 995 F.3d 786, 798 (10th Cir. 2021) (citing *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents*, 307 F.3d 137, 149 (3d Cir. 2002) (Alito, J.)). To be sufficiently particular, a warrant must reasonably limit what material law enforcement can search for and seize. *United States v. Russian*, 848 F.3d 1239, 1245 (10th Cir. 2017); *see also United States v. Wagner*, 951 F.3d 1232, 1247 (10th Cir. 2020) (stating that "the Fourth Amendment specifies only two matters that must be particularly described in the warrant: 'the place to be searched' and 'the persons or things to be seized.'" (cleaned up)).

**a.** Clark argues that the warrant's language is insufficiently particular because it allowed officers to seize and search "any internet-ready or storage electronic device for 'contraband,' unrelated to sexual exploitation of a child." Doc. 29 at 27. Clark takes issue with the structure of the second paragraph on the warrant's first page, *id.* at 25–26, which permitted law enforcement to search for and seize "[a]ll information contained on the electronic devices and storage devices, including all images, videos, application data, internet search history and content, and all information for the purpose of the investigation of Sexual Exploitation of a child." Doc. 29-3 at 1. According to Clark, the first clause ("All information contained on the electronic devices . . . including . . . internet search history and content") allowed officers to search for all content on his internet-capable devices and was not limited by the second clause's language connecting the device to the crime of sexual exploitation of a child. Doc. 29 at 25–26.

This argument ignores two points. First, this paragraph is a subparagraph of the preface, in which the issuing judge states that she found "probable cause to believe that the crime of Sexual Exploitation of a Child has been or

is being committed" and that certain, related items would be found. Doc. 29-3 at 1. Second, search warrants should be construed in a "practical and commonsense fashion, avoiding a hypertechnical reading of their terms." *United States v. Suggs*, 998 F.3d 1125, 1133 (10th Cir. 2021). The warrant's preface constrained the officers' search to evidence of a specific crime, satisfying the particularity requirement. *See United States v. Brooks*, 427 F.3d 1246, 1252–53 (10th Cir. 2005); *see also United States v. Burke*, 633 F.3d 984, 992–93 (10th Cir. 2011). And determining whether a warrant is sufficiently particular should not focus on its selective portions. *United States v. Wagner*, 951 F.3d 1232, 1248 (10th Cir. 2020). Rather, the warrant must be read in context. *Id.*

In *Wagner*, the Tenth Circuit held that the warrant at issue was sufficiently particular despite the fact that some categories of items allowed officers to search for "any and all computer software," while others specified child pornography. 951 F.3d at 1248. The Court found that the warrant as a whole "contained sufficiently particularized language requiring a nexus with child pornography." *Id.* The same is true here. Clark's reading of the warrant—which construes the two clauses as independent, thus permitting law enforcement to search for evidence of *any* crime—is hypertechnical and at odds with the stated purpose of the warrant and the limiting scope approved by the issuing judge.

The Tenth Circuit's decision in *Otero* does not suggest a different conclusion. *Contra* Doc. 29 at 25. There, the warrant at issue was "neatly divided into two subsections: 'ITEMS TO BE SEIZED' and 'COMPUTER ITEMS TO BE SEIZED.'" *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009). And each paragraph under the first section limited the search to evidence of specific crimes or evidence, but the paragraphs under the second section, in contrast, had no limiting instruction whatsoever. *Id.* As a result, the Tenth Circuit held invalid the latter subsection because there was no explicit or implicit limitation on what could be searched. *Id.* at 1132–33.

Unlike the unlimited subsection in the *Otero* warrant, all of this warrant's several subsections are, in context, subject to the internal express limitation provided by the heading or preface of the warrant that focuses on sexual exploitation of a child. Doc. 29-3. Specifically, the warrant declares there to be probable cause to believe that the crime of sexual exploitation of a child has been or is being committed and directs that evidence relative to that crime be searched. *Id.* There is no separate subsection with unrestrained discretion. This limitation is sufficiently particular. *See Brooks*, 427 F.3d at 1252–53; *United States v. Palms*, 21 F.4th 689, 698 (10th Cir. 2021) (observing that "warrants for computer searches must affirmatively limit the search to evidence of specific crimes or specific types of material") (citation and internal quotation marks omitted).

**b.** Clark also argues that two other paragraphs of the warrant, 2(e) and 3, are impermissible catchalls. Doc. 29 at 26. Those paragraphs allowed officers to search for and seize items that "are contraband or are fruits, instrumentalities, or evidence of such crime." Doc. 29-3 at 1–2. Clark asserts that the first clause, items that are contraband, is not limited by the second clause's "such crime" (*i.e.*, sexual exploitation of a child) language. Doc. 29 at 26–27.

In support, he relies on *United States v. Suggs*, 998 F.3d 1125 (10th Cir. 2021). Doc. 29 at 26. The warrant in *Suggs* had a catchall phrase which stated, "any item identified as being involved in crime." 998 F.3d at 1131. In invalidating the warrant, the Tenth Circuit made several points. First, use of the word "crime" referenced criminal activity in general rather than "a specific act or incident punishable by law." *Id.* at 1133. Thus, officers were authorized to "to search for and seize evidence of *any* crime." *Id.* (emphasis added). Second, the phrase was "not tacked onto or linked with any of the other operative sentences describing the items to be searched for and seized." *Id.* Rather, the phrase sat by itself under the label "miscellaneous." *Id.* Those "structural features" indicated that the phrase was "subject to no affirmative limitations other than that the items sought must be evidence of criminal activity." *Id.* at 1134. That interpretation was confirmed by the fact that the warrant did not specify the crime under investigation. *Id.*

The warrant here has none of those defects. It twice defined the crime for which there was probable cause: Sexual Exploitation of a Child. Doc. 29-3 at 1. And, when it did not refer to that crime by name, it did so specifically, referring to it as "such crime" rather than " any crime" generally. Doc. 29-3 at 1, 2. And none of these "catchall paragraphs" sits alone. *Id.* Rather, each is a subparagraph and, again, each is subject to the preface which limited the officers to searching for and seizing items related to the crime of sexual exploitation of a child. Doc. 29-3 at 1.

The Strunk-and-White parsing of the structure of the warrant that Clark suggests is misplaced. Courts are directed to "construe search warrants in a practical and commonsense fashion, avoiding a hypertechnical reading of [their] terms." *Suggs*, 998 F.3d at 1133. Applying that type of construction confirms that the warrant was sufficiently particular and limited. It directs the officers to search for contraband, *i.e.*, CSAM, as well as "fruits, instrumentalities, or evidence" related to the crime of sexual exploitation of a child. Doc. 29-3. That is enough. *Brooks*, 427 F.3d at 1252–53. The warrant does not fail for lack of particularity.

**2.** Clark next contends that the residential warrant fails for lack of probable cause because there is no nexus between the suspected activity and the items to be searched. Doc. 29 at 28. According to Clark, the affidavit "failed

to establish that the single online incident on May 30, 2019[,] created a fair probability that the Omegle user collected child pornography or stored, shared, or transferred images among electronic devices." *Id.* at 29. That contention contains several arguments, none of which compels the conclusion that the warrant is invalid.

**a.** Clark cites *United States v. Edwards*, 813 F.3d 953 (10th Cir. 2015), in support of his argument that the affidavit failed to contain critical information. Doc. 29 at 29–31. There, the Tenth Circuit was asked to decide whether the affidavit "established probable cause that *child pornography* would be found at [the defendant's] home." *Edwards*, 813 F.3d at 961 (emphasis original). That affidavit "averred only that [the defendant] was known to possess *legal child erotica*," *id.* at 963 (emphasis added), and that "persons found in possession of illegal child pornography are highly likely to also possess legal child erotica," *id.* at 965. The court reasoned that the affiant's statements about collectors of child pornography did not establish probable cause because there was no evidence that the defendant was such an individual—nothing in the affidavit alleged that the defendant was found in possession of child pornography. *Id.* at 965, 969.

Clark argues that the affidavit fails in the same way because there is no evidence from the single Omegle chat that he was one who collects child pornography or retains such images on devices in his home. According to Clark, that single incident was akin to the defendant in *Edwards* possessing legal child erotica and the affidavit describing the proclivities of collectors is similarly irrelevant. Doc. 29 at 30.

This argument fails on at least two grounds. First, it relies on the premise that law enforcement was only permitted to review the single file that a human reviewer at Omegle also viewed. But the affidavit relied on Officer Bishop's review of all of the screenshots, Doc. 29-2 at 2, which was permissible. *See* Part II.A., *supra*. Testimony at the hearing revealed that, based on the review of all of the screenshots, law enforcement knew that Clark was transmitting stored, rather than live, videos and images because the screenshots contained different people and backgrounds, and because some screenshots contained a blue diamond watermark, a smiley face emoji over an individual's face, and text. Thus, Officer Bishop's statements about collectors was fitting with regard to Clark.

Second, *Edwards* is factually inapposite even assuming that law enforcement was permitted to rely on only the single file that, standing alone, might not have supported the broad collection that Clark displayed. Officer Bishop's affidavit described the single file as depicting a child under the age of six engaged in an explicit sexual act with an adult male. Doc. 29-2 at 2.

This was not legal child erotica and Clark did not engage in "innocent or legal conduct" like the defendant in *Edwards*. 813 F.3d at 965. The Tenth Circuit's "reluctan[ce] to presume that persons are inclined to engage in certain illegal activity based on having engaged in a particular legal activity," *id.* at 964, is inapplicable on these facts.

And Clark's argument that the single screenshot might have captured a live act (instead of a recorded one) is immaterial to the probable cause inquiry. Doc. 29 at 30. It was unlawful under both state and federal law, and Clark's transmission of it constituted a child pornography crime. Kan. Stat. Ann. § 21-5510 (criminalizing, among other things, both the possession and transmission of child pornography); 18 U.S.C. § 2252(a) (criminalizing the distribution of a production of child pornography). And courts have frequently recognized that one who comes into possession of child pornography, whether by their own production or a prior recording, typically collects other unlawful images and videos. *See United States v. Riccardi*, 405 F.3d 852, 861 (10th Cir. 2005) (noting that "possessors often keep electronic copies of child pornography"); *United States v. Pena*, No. CR 19-3611, 2021 WL 5280247, *27 (D.N.M. Nov. 12, 2021) (holding the warrant was supported by probable cause when the affidavit described, among other things, the fact that those who "distribute, possess, or produce child pornography exhibit 'collector behavior'"); *United States v. Grisanti*, No. 416CR00018, 2018 WL 1522656, at *2 (S.D. Ind. Mar. 28, 2018) (noting that Omegle users may take screenshots of chats).

Two cases involving similar facts are instructive. In *United States v. Manning*, 361 F. Supp. 3d 839 (D. Minn. 2019), the court rejected the defendant's argument that the issuing judge had "no basis for concluding" that he had "a demonstrated interest in child pornography" based on a single Omegle snapshot depicting child pornography. *Id.* at 847. "Surely a judge can reasonably infer that a man who would stream a depiction of the sexual molestation of a child to a stranger that he recently met through Omegle would have at least as much interest in collecting child pornography as someone who had downloaded child pornography from the Internet or sought child pornography in a chat room." *Id.* And in *Hubbard v. Commonwealth*, the Kentucky Court of Appeals upheld the trial court's denial of the defendant's motion to suppress because the affidavit linked CSAM with the IP address and the residence noting that it was "irrelevant whether the [Omegle screenshots] were photos, pre-recorded videos, or live-stream because each is a felony and would provide a magistrate with probable cause to conclude that a search warrant would uncover evidence of wrongdoing." No. 2019-CA-000763, 2020 WL 3027310, at *4 (Ky. Ct. App. June 5, 2020).

Clark's reliance on *United States v. Raymonda*, fares no better. Doc. 29 at 32 (citing 780 F.3d 105 (2d Cir. 2015)). There, the Second Circuit specifically noted that "evidence that such persons possessed child pornography in the past supports a reasonable inference that they retain those images—or have obtained new ones—in the present." *Raymonda*, 780 F.3d at 114. In examining whether a defendant may be considered a collector of child pornography based on his access to it at a single time in the past, the court distinguished "willfully and deliberately" accessing images from "a purely negligent or inadvertent encounter." *Id.* at 115. Probable cause was lacking because there was no evidence that Raymonda deliberately sought to view child pornography. *Id.* at 117. But an individual, like Clark, transmitting CSAM to others falls comfortably into the former category of willful behavior. *Id.* Even accepting his argument that he could have been transmitting a live video, that transmission was "sufficiently deliberate or willful to suggest that he was an intentional 'collector' of child pornography." *Id.* at 117.

This is not a case where the affidavit set forth evidence of one crime that allowed officers to search for evidence of other crimes. *Contra* Doc. 29 at 30–33. The affidavit, which was supported by the Omegle screenshot, and the warrant all evinced the same crime—sexual exploitation of a child. Docs. 29-2 & 29-3.

Officer Bishop's statements that Clark was a collector who would save child pornography on multiple devices is consistent with the foregoing authorities. *Contra* Doc. 29 at 31. And Clark has not demonstrated that Bishop needed to have corroborated her statements about a collector's behavior with evidence of a "prior conviction, arrest, or other known internet activity." *Contra* Doc. 29 at 31. "Probable cause is a matter of probabilities and common sense conclusions, not certainties." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014). This is not an "inferential fallacy of ancient standing." *Contra* Doc. 29 at 31–32 (quoting *United States v. Falso*, 544 F.3d 110, 122 (2d Cir. 2008)). The issuing judge made a commonsense conclusion, based on the affidavit and her everyday knowledge, that those who possess and send child pornography likely retain those images and videos on their electronic devices. That is legally sufficient. *United States v. Haymond*, 672 F.3d 948, 959 (10th Cir. 2012) (holding an affidavit was sufficient to establish probable cause to search the defendant's home because it described the fact that a user with an IP address linked to the defendant's residence possessed numerous files of child pornography).

**b.** Clark next argues that the issuing judge was not permitted to rely on Officer Bishop's statements about collectors because Bishop's affidavit did

not recite her professional background or experience. Doc. 29 at 31.[7] "For an officer's experience and training to support a finding of probable cause, the affidavit must set out facts explaining why, based on this experience and training, there was reason to believe the contraband is more likely to be found at the particular location." *Poolaw v. Marcantel*, 565 F.3d 721, 732 n.10 (10th Cir. 2009) (citing *United States v. Rowland*, 145 F.3d 1194, 1205 n.5 (10th Cir. 1998)). In the affidavit, Officer Bishop explained why evidence of child pornography would likely be found at the residence eight months after the incident (*e.g.*, those who collect, retain) and why those images and videos may exist on multiple devices. Doc. 29-2 at 3.

Officer Bishop was not required to provide background on her training and experience in the affidavit to support her belief that evidence of a crime would be located at Clark's address. *Contra* Doc. 29 at 31, Doc. 37 at 13. The facts and circumstances of the crime that Bishop described plainly do that. And the cases on which Clark relies to support this requirement are inapposite because they involved specialized knowledge and training, such as discerning and detecting the odor of unlawful drugs, *Hervey v. Estes*, 65 F.3d 784 (9th Cir. 1995) (methamphetamine), *United States v. DeLeon*, 979 F.2d 761, 765 (9th Cir. 1992) (growing marijuana plant), or supporting a witness's qualifications to offer expert testimony under Fed. R. Evid. 702, *United States v. Huether*, 673 F.3d 789, 797 (8th Cir. 2012), *United States v. Romero*, 189 F.3d 576, 585 (7th Cir. 1999). Doc. 50 at 1. It is true that sometimes specialized skill, training, and background knowledge are required to deduce from "objective facts, meaningless to the untrained," that criminal conduct is afoot. *See United States v. Cortez*, 449 U.S. 411, 419 (1981) (finding multiple deductions and inferences based on particularized knowledge was sufficient to support an inference of criminal conduct). But it takes no such training or skill to conclude that an individual possessing a video depicting a child under the age of six engaged in an explicit sexual act with an adult male would also possess other, similar contraband. *See United States v. Riccardi*, 405 F.3d 852, 861 (10th Cir. 2005) (observing that, in the staleness context, "[t]he observation that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes is supported by common sense and the cases") (quoting *United States v. Lamb*, 945 F. Supp. 441, 460 (N.D.N.Y. 1996)).

---

[7] Clark also takes issue with the fact that Officer Bishop did not identify herself as a law enforcement officer in the affidavit. It is safe to assume that this judge knew that Bishop was a law enforcement officer seeking a search warrant from her: the warrant the judge issued identified "Officer Lindsay Bishop" as the affiant. Doc. 29-3 at 1.

**c.** In his reply, Clark also briefly raises the issue of staleness. Doc. 37 at 14. He argues that, because the single screenshot does not indicate that the May 2019 video was prerecorded or stored on a device, there is no evidence of "an ongoing offense of child pornography collection" that would support the search of his home eight months later. Doc. 37 at 14. It is undoubtedly true that "[p]robable cause cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched." *United States v. Wagner*, 951 F.3d 1232, 1246 (10th Cir. 2020). Whether information is too stale depends on "the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *Id.* Information regarding child pornography is less likely to be stale given that defendants are likely to "hoard" that information "in the privacy of their homes for significant periods of time." *Id.* (noting that the Tenth Circuit has rejected staleness challenges even where information was five years old); *see also United States v. Perrine*, 518 F.3d 1196, 1205–06 (10th Cir. 2008).

Clark's staleness argument fails for at least two reasons. One, again, is that it depends on a finding that law enforcement was not permitted to review all of the Omegle screenshots. *See* Doc. 37 at 14. But they were. And they more than adequately suggest an ongoing child pornography crime is likely occurring. And two, even if law enforcement had only been permitted to rely on the single screenshot, eight months between the broadcast and the search was not so long to suggest that evidence of the crime would no longer be found at his residence. *Contra* Docs. 37 at 14 & 50 at 2; *Riccardi*, 405 F.3d at 860–61 (rejecting staleness challenge based on 5-year gap); *Perrine*, 518 F.3d at 1206 (111-day gap); *Haymond*, 672 F.3d at 959 (107-day gap); *Wagner*, 951 F.3d at 1246 (6-month gap); *see also United States v. Irving*, 452 F.3d 110, 125 (2d Cir. 2006) (2-year gap); *United States v. Williams*, 787 F. App'x 875, 878 (6th Cir. 2019) (rejecting a staleness challenge based on an 8-month gap and observing that "images of child pornography can have an infinite life span").

Clark further asserts that *United States v. Renigar* is distinguishable. Doc. 50 at 1–2 (citing 613 F.3d 990 (10th Cir. 2010)). According to Clark, the fact that, in *Renigar*, multiple files were downloaded—*i.e.*, "*actually stored on a device*"—on "*multiple occasions*" distinguishes it from this case. Doc. 50 at 1. Further, the affidavit in support of the warrant explained that "evidence of those files could still reside on the device *two months* later." *Id.* at 2. But here, a single, possibly live-streamed incident of CSAM was transmitted and the affidavit did not explain that this single live stream could "create forensic evidence" which would still exist eight months later. *Id.*

Even assuming that officers were only permitted to rely on the single Omegle file, Clark's attempts to distinguish *Renigar* are unpersuasive. Clark is correct that *Renigar* is factually distinct in that different agents observed that

the defendant had CSAM available for download from his computer on separate occasions. 613 F.3d at 992. But the Tenth Circuit did not base its holding on these differences. Rather, it found that the affidavit "linked the IP address in question to both child pornography and to the residential address." *Id.* The affidavit here did the same. In fact, the Tenth Circuit relied on a Fifth Circuit case which found probable cause based on a single episode of CSAM being transmitted via a certain IP address which was tied to the defendant and a residential address. *Id.* at 994 (citing *United States v. Perez*, 484 F.3d 735, 740 (5th Cir. 2007)). Clark is also correct that the affidavit in *Renigar* provided a background on computer technology, which described how to use a computer to access and share files and that erased files may nonetheless be recovered, *id.* at 993, that is absent here, Doc. 50 at 2. But the issuing judge is "entitled to go beyond the averred facts and draw upon common sense in making reasonable inferences from those facts" when making the probable cause determination. *Grimmett*, 439 F.3d at 1270. Clark has failed to identify any reasonable basis to conclude that the issuing judge here would have needed an explanation of how those who traffic in child pornography utilize computers to accomplish their tasks.

**3.** Clark also makes a somewhat related argument that all of these issues compel a finding that there was no nexus between the suspected activity and the items to be searched. Doc. 29 at 28. "A nexus must exist between suspected criminal activity and the place to be searched." *United States v. Biglow*, 562 F.3d 1272, 1278 (10th Cir. 2009). That nexus "may be established through normal inferences about the location of evidence" and "depends on the facts of each case." *Id.* at 1279–80. Clark asserts that the single screenshot did not demonstrate that he was a collector and so there is no evidence that he had collector-tendencies and would both possess child pornography and share that data between devices in his home. Doc. 29 at 30–33.

Even accepting Clark's argument that law enforcement was permitted to rely only on the single screenshot, Bishop's affidavit provided an adequate basis for probable cause to believe that child exploitation was occurring in Clark's home by way of internet-capable devices within that home. Bishop's affidavit stated that the Omegle CyberTipline Report found that a user with a specific IP address traceable to Clark's home "showed a webcam video that contained child pornography." Doc. 29-2 at 2. That single screenshot was child pornography. The affidavit stated that "no unsecured WIFI networks were detected" outside the residence, *id.* at 3, suggesting that an individual within the home used the home's secure Wi-Fi to transmit CSAM. It also stated that Officer Bishop knew that individuals "who collect child pornography typically retain the images for later viewing" and "that electronic images and videos can be easily shared and transferred between electronic

devices." *Id.* at 3. This was sufficient to find a nexus between sexual exploitation of a child—*i.e.*, possessing or transmitting child pornography—and the electronic devices in Clark's residence. *United States v. Rowland*, 145 F.3d 1194, 1204 (10th Cir. 1998); *United States v. Wagner*, 951 F.3d 1232, 1247 (10th Cir. 2020).

**4.** Finally, Clark briefly argues that the warrant was overbroad. Doc. 29 at 35. An overly broad warrant is one that "'describes in both specific and inclusive generic terms what is to be seized, but it authorizes the seizure of items as to which there is no probable cause.'" *United States v. Cotto*, 995 F.3d 786, 798 (10th Cir. 2021) (quoting *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars & Fifty-Seven Cents*, 307 F.3d 137, 149 (3d Cir. 2002) (Alito, J.)).

Clark argues that "the government had no probable cause to search for child pornography . . . on electronic devices" and so the warrant, which authorized the search and seizure of these items, was overbroad. Doc. 29 at 35. But law enforcement had probable cause to search for child pornography on these devices whether based on the single screenshot or on all of them. *See* Part II.B.2–3., *supra*. A device with a specific IP address sent CSAM. Law enforcement did not know which device was used to share the CSAM or, given the multiple individuals who resided within that home, who owned that device. They knew only that there was a link between the IP address associated with the transmission and the residence. That link was sufficient to find probable cause to search for and seize electronic devices within the home. *United States v. Renigar*, 613 F.3d 990, 993–94 (10th Cir. 2010) (holding a similar link provided "a strong suggestion that the computer which [defendant] used to access the [] network would be found at the apartment and would contain evidence associated with child pornography and/or its transmission").

### III

For the reasons set forth above, Clark's motion to suppress, Doc. 29, is DENIED.

It is so ordered.

Date:  May 18, 2023              _s/ Toby Crouse_____
                                 Toby Crouse
                                 United States District Judge